Filed 11/22/23  P. v. Lopez CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VICENTE FRANCISCO LOPEZ,<br><br>Defendant and Appellant. | B318535<br><br>(Los Angeles County Super. Ct. No. KA060104) |

APPEAL from an order of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

Jonathan E. Demson for Plaintiff and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Vicente Francisco Lopez (defendant) appeals from the order denying his petition for vacatur of his murder conviction and resentencing following an evidentiary hearing held pursuant to Penal Code section 1172.6, subdivision (d).[1]  The trial court found the prosecution had met its burden to show beyond a reasonable doubt that defendant was not entitled to resentencing.  Defendant contends the order should be reversed on the ground it is not supported by substantial evidence.  Defendant also contends the trial court failed to consider his youth at the time of the crime, and thus the matter should be remanded for that purpose.  Finding no merit in defendant's contentions, we affirm the order.

## BACKGROUND

In 2003, defendant and codefendants Frank Eddie Quintero, Raymond Salvador Ramirez, and Juan Lucas Soto, were convicted of first degree murder, two counts of second degree robbery, one count of assault with a deadly weapon and conspiracy to commit robbery.  The jury found true the robbery-murder special circumstance alleged under section 190.2, subdivision (a)(17).  Defendant was sentenced to life without the possibility of parole for the murder, with sentences stayed on the remaining counts.  This court affirmed the judgment on direct

---

[1]  Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)  We will refer to the section by its new numbering only.

All further unattributed code sections are to the Penal Code unless otherwise stated.

2

appeal.  (See *People v. Lopez* (Oct. 6, 2004, B170919) [nonpub. opn.].)

**2003 trial evidence**

Bobby Bionghi testified he lived in the city of La Puente in 2002 and had been a member of the Barrio Puente gang for 13 or 14 years.  He knew defendant, Soto, Quintero, and Ramirez, who were members of various cliques of the La Puente gang, and he identified them in court.  On August 20, 2002, the four men visited him unexpectedly while he was outside his house.  A car driven by Lorraine Calvillo pulled up next to Bionghi, who was working on his car.  First Soto approached Bionghi and then the other three men got out while Calvillo remained in the car.

Soto asked Bionghi whether he would be interested in being the getaway driver in a robbery.  Soto opened the hood of the car in which he had just arrived, snapped open an air filter, and pulled out a nickel-plated .357 revolver.  Bionghi got a clear view of two other weapons, which looked like a .32- or .25- and a .380-millimeter semiautomatic, both black and smaller than the revolver.  Bionghi thought there might have been a third gun.  The other three men were about two to three feet away from him and Soto as Soto spoke in a "common loud tone of voice."

After Soto had taken out the gun, Bionghi and defendant had a brief conversation.  Defendant mentioned a store in El Monte on the corner of a busy street and another establishment right around the corner from Bionghi's residence, a tax business with a fundraising box that would be easy to access.  Defendant said it would be a quick job because they knew where the money was kept.  Soto was still beside Bionghi during this conversation and the other men were in the same place as before.  Bionghi said he was not interested, that he was on parole for robbery and trying to discharge.  Soto then put the revolver back in the air

3

filter compartment, closed the hood of the car and they left. About an hour later, Bionghi heard sirens and a helicopter.

Calvillo testified she remained in the car in Bionghi's driveway and was unable to hear the conversations. After leaving Bionghi, Soto drove the car. Calvillo did not know where he was going, nor did she ask. When Soto stopped the car he said there was a tax place with a box of money and they were going to check it out. Soto then parked in a residential area, and Calvillo remained in the car.

Camilo Castro, who operated an income tax business with his sister, Carmen Castro, testified they kept a large collection box in the office for donations to a charity he ran.[2] The box was located inside the front door in the lobby next to the door to Carmen's office, the first office to the right of the entrance to the building.

Camilo was in the back office with Maria Lagos and her teenage brother Luis Lagos, when he heard two or more gunshots in quick succession coming from the front of the business. Carmen was in her office but Camilo did not hear her voice. Almost immediately after the gunshots, Camilo saw a person holding a gun at his office door. The gunman ordered them to go under the desk, yanked the phone from Camilo's desk, and then took Camilo's cell phone. He also took Maria's keys, phone, and wallet from her purse, and ordered them to stay there.

The gunman left the back office, and Camilo heard a commotion and banging noises coming from the lobby, including the sound of the fax machine being dropped on top of the money

---

[2]     After first mention we use first names only for those who share the surname of other witnesses or victims. We mean no disrespect.

box causing it to fall to the floor. After a few minutes of not hearing voices, he said "hello" and received no reply. Camilo then went to check on Carmen. He found her dead at her desk and the robbers gone. Camilo went outside and saw his neighbor Charles Visitor calling the police.

Maria testified that she was in the back office when she heard the front door open, a slam, and a noise like a surprised sort of scream from Carmen. She moved her head to see three men, one walking toward the back office, and two behind him. The man coming toward the back office had a gun. Luis testified he was focused on counting tickets when he heard gunshots, a slight scream, and then another gunshot. He looked up and saw someone coming into the back office and a man holding a chrome-colored handgun pointed toward Carmen's office. The man coming to the back office pointed his gun at Maria.

Visitor testified he ran a business adjacent to the tax office and has been a business associate of Camilo's for 19 years. At approximately 3:30 p.m. the day of the robbery, while at his desk, he heard four loud gunshots in rapid succession that sounded close.

Visitor walked into the lobby of the tax business where he saw a man facing the door of Carmen's office. Two other men were squatting on the floor picking up money that was scattered around. Visitor later identified the man facing Carmen's door as Quintero.

A second man, who Visitor later identified as Soto, came out of the building, hit Visitor in the head with something and then ran in the same direction as Quintero. A third man then came out of the building and ran past Visitor in the direction of the first two. Visitor was unable to identify the third man.

5

Calvillo had turned the car around, and the men came running and jumped in. Calvillo testified she saw they all had money in their pockets. As she drove to her house the men all talked about what they had just done. She said "they" were asking Soto, "Why did you shoot her?" Soto said he had shot a woman because she screamed and yelled for her brother. Soto had told her to shut up, and he hit her, but "she still wouldn't shut up." Calvillo saw Soto had a long silver gun, and defendant had a black gun. They all said there would be no fingerprints because they wore latex gloves, which they threw out the car window onto the freeway. Defendant also threw Maria's purse, license, and credit cards out the window.

**Section 1172.6 petition for resentencing**

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.), which amended the laws pertaining to felony murder and murder under the natural and probable consequences doctrine, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Section 1172.6 provides a procedure for those convicted of murder or attempted murder to seek retroactive relief if they could not now be convicted under the amended laws. (§ 1172.6, subd. (a); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

In March 2021, defendant filed a petition for resentencing pursuant to section 1172.6. After the prosecution stipulated defendant had made a prima facie showing of eligibility under the statute, the trial court received briefing, held an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3) and denied the petition on February 15, 2022.

6

At the hearing the trial court stated it had reviewed the abstract of judgment, the charging documents, the preliminary hearing transcript, trial transcript, jury instructions, Court of Appeal decision, and the documents submitted by counsel.[3] The prosecutor submitted the matter on the trial transcript without presenting additional evidence. The defense presented defendant's testimony.

**Defendant's hearing testimony**

On direct examination defendant testified that on August 20, 2002, he was a member of the La Puente gang and was at Bionghi's house sometime in the midday or afternoon. After fellow La Puente gang members Quintero, Ramirez, and Soto joined them they were all "hanging out." Defendant had known Soto about a year and knew he was a little crazy, on edge, and did not really care about anything. Defendant had known the others for about two years. At that time Soto was 20 years old, Ramirez was 17, Quintero was 18, and defendant was 19.

Defendant claimed Soto pulled Bionghi aside to talk to him, and defendant was not part of that conversation, did not know then what it was about  and only later learned it was about doing a robbery. He denied being in earshot of Soto's conversation with Bionghi. He claimed Bionghi gave inaccurate trial and preliminary hearing testimony and that Bionghi used a lot of drugs. After the conversation with Bionghi, defendant spoke to Ramirez and Quintero about doing a robbery. Defendant had previously committed robberies with them  and called them

---

[3]     Defendant objected to the admission of preliminary hearing testimony without a foundational showing of unavailability of each witness. The objection was overruled, and defendant does not challenge that ruling.

"holdups" without guns. He claimed no one had any guns at the time of his conversation with Ramirez and Quintero.

With the plan to commit a robbery in El Monte, defendant, Ramirez, Quintero, and Soto got into a car driven by Calvillo. Soto sat in the front passenger seat. Defendant sat in the back middle seat with Quintero and Ramirez. Defendant claimed he was then unaware of any guns in the car. The plans changed on the way when Soto said he knew of a charity money box in an income tax business just around the block from Bionghi's house. Calvillo parked on a nearby street and remained in the car as the others got out. Soto opened the hood of the car and from the air filter they retrieved two guns defendant had not known were there. Defendant was given a gun with an orange tip on the barrel that he claimed was a BB gun and not a real gun.[4] They went into the tax office, which was about 50 or 60 feet around the corner. Soto entered first, then defendant, then Quintero.

Once inside Soto went to the first front office, and defendant went to the back office, which was about 50 to 60 feet from the front, because he saw people there. Defendant claimed he went straight back and did not know what Soto was doing in the front office. In the back office defendant told the three people there to lie down, and then he robbed them. When he pointed his gun at them he threatened to shoot them, but he never meant to harm anyone. Defendant pulled the phone wires from the wall so they could not make a call and then took the woman's purse. He then heard a loud bang and thought it might have been the charity box falling.

---

[4]    No evidence was found in the record regarding whether an orange tip on a gun means it is not a real gun.

Defendant saw Soto and Quintero run outside and followed them out. As he ran he saw a person who had been shot slumped over and was shocked because there was never an intent to harm anyone. He continued running out and back to the car. When everyone was back in the car, defendant, Ramirez and Quintero were upset with Soto and asked why he had shot the woman. Soto explained it was because she would not shut up. Defendant denied ever having a discussion beforehand about harming anyone, and he never thought that would happen. Defendant never hit or touched anyone in the back office and claimed he did not threaten them.

Defendant said he never used a gun in the three or four robberies he had previously committed and knew he was using a toy weapon when he went into the tax office. He also claimed he did not get a good look at Soto's gun, had never seen it before, and did not know whether it was loaded. Defendant had not committed a prior robbery with Soto and denied knowing Soto was the sort of person who would shoot someone for screaming or crying. Defendant said he could not have prevented the shooting because upon entering he had gone straight to the back, and when he went past the woman as he left, he believed he could not help her.

On cross-examination defendant denied knowing they were going to rob the tax business when they were at Bionghi's house or telling Bionghi it would be a quick job because he knew exactly where the cash box was located. Defendant also denied he tried to persuade Bionghi to be the driver, that Soto opened the hood in his presence to show Bionghi the guns, or that he stood near Bionghi and Soto when Soto was talking to him about driving. Defendant claimed he did not see the guns before they parked at the tax office, and there were only two guns. Defendant denied

9

hearing Carmen call out for her brother or the sounds of Soto beating her when he entered the business, which happened after he entered the back office. He said he did not try to help her because he was not in the "vicinity" and because he was occupied in the back office. Defendant admitted taking Maria's wallet, keys, cell phone, and other things, which he later threw out the window, but denied threatening the people in the back office if they had a cell phone.

Later at Calvillo's apartment the money was split four ways, but defendant could not recall the size of his share. Defendant claimed he used a BB gun that he kept, but admitted it was not on him or in his house when he was arrested. He claimed not to know Soto was the sort who could murder someone, although he had known Soto for about a year and thought he was a little crazy and "didn't care about nothing."

**The trial court's ruling**

The court denied the petition upon finding beyond a reasonable doubt that defendant had been a major participant in the underlying robbery who acted with reckless indifference to human life and was thus ineligible for relief.

Defendant filed a timely notice of appeal from the order of denial.

## DISCUSSION

### I.    Eligibility for resentencing

A defendant is eligible for resentencing under section 1172.6 if he or she could not have been convicted of murder under the definition of murder as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.). (See *Lewis, supra*, 11 Cal.5th at p. 957; *People v. Gentile* (2020) 10 Cal.5th 830, 843.) Prior to 2019, at the time of defendant's trial, when an accomplice killed another

10

during an inherently dangerous felony such as robbery, an aider and abettor of the robbery could be convicted of murder without a showing of intent to kill or implied malice. (*People v. Strong* (2022) 13 Cal.5th 698, 704, 707 (*Strong*).) Senate Bill No. 1437 amended section 189, subdivision (e) to limit felony murder liability to actual killers, aiders and abettors with the intent to kill, or major participants in the underlying felony who acted with reckless indifference to human life as described in section 190.2, the statute defining the felony-murder special circumstance. (*Strong*, at pp. 707-708.)

Defendant concedes that substantial evidence supported the trial court's finding that he was a major participant in the crime, however he contends the trial court's finding that he participated in the underlying robbery with reckless indifference to human life was not supported by substantial evidence, and the court thus erred in ruling he was ineligible for resentencing under section 1172.6.

## II. Standard of review

Once a defendant has made a prima facie showing of eligibility for relief, an evidentiary hearing is to be conducted pursuant to section 1172.6, subdivision (d). "[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, . . . that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); see *id.*, subd. (c).) The trial court sits as an independent fact finder (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951) and must "'review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard . . .'" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480, quoting *People v. Clements* (2022) 75 Cal.App.5th 276, 298). On appeal from the denial of a petition after hearing, our task is to determine

11

whether any rational trier of fact could have made the same determination beyond a reasonable doubt.  (*People v. Vargas, supra*, at p. 951.)  We defer to the trial court's resolution of conflicts and credibility determinations.  (*People v. Clements, supra*, at p. 298.)

We apply the substantial evidence standard of review.  (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233-234.)  Under the usual substantial evidence standard, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "The same standard applies when the conviction rests primarily on circumstantial evidence."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence."  (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  "The standard is deferential, but the evidence in support of the judgment must be *reasonable, credible, and of solid value*; 'a mere possibility' or '[s]peculation is not substantial evidence [citation]."  (*People v. Brooks* (2017) 3 Cal.5th 1, 120.)  "[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.'"  (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.)  Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

III.   *Banks* **and** *Clark* **Factors**

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California

Supreme Court "substantially clarified the law surrounding major participant findings," and "then substantially clarified the relevant considerations for determining whether a defendant has acted with reckless indifference to human life." (*Strong, supra*, 13 Cal.5th at pp. 720-721.)

The reckless indifference requirement was first articulated in *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida* (1982) 458 U.S. 782 in relation to the imposition of the death penalty. In *Banks* and *Clark*, the California Supreme Court clarified the definitions of major participant and reckless indifference to human life and suggested relevant considerations for the trier of fact in making that determination. "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks, supra*, 61 Cal.4th at p. 803); what matters is the totality of the circumstances (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*)).

The factors used to determine whether a defendant was a major participant include the following considerations: the role played by the defendant in planning the underlying crime; the role the defendant had in supplying or using a lethal weapon; the awareness of the defendant of the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants; the defendant's presence at the scene of the killing; and the defendant's action after lethal force was used. (*Clark, supra*, 63 Cal.4th at p. 611; *Banks, supra*, 61 Cal.4th at p. 803; see *Scoggins, supra*, 9 Cal.5th at p. 677.)

With regard to reckless indifference to human life, *Banks* explained it as engaging in a felony known to carry a grave risk of death while ""*subjectively* aware that his or her participation in the felony involved a grave risk of death."" (*Banks, supra*, 61 Cal.4th at pp. 801, 807.) Thus, "felony murderers . . . , who

13

simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life" (*id*. at p. 809) because "only knowingly creating a 'grave risk of death' satisfies the constitutional minimum" (*id*. at p. 808) articulated by the United States Supreme Court in *Tison v. Arizona, supra*, 481 U.S. at page 158 and *Enmund v. Florida, supra*, 458 U.S. at page 798.

In *Scoggins*, our Supreme Court gleaned factors from *Banks* and *Clark* to guide the determination whether the defendant was subjectively aware that his participation involved a grave risk of death. As relevant here, factors to consider in determining whether the defendant was subjectively aware that his participation in the underlying felony involved a grave risk of death are the defendant's awareness that a gun would be used during the robbery; the number of weapons ultimately used; the defendant's physical presence at the crime; the opportunity, if any, to restrain the crime or aid the victim; the duration of the interaction between the perpetrators and the victims; the defendant's knowledge of his confederate's propensity for violence; any efforts defendant made to minimize the risks of violence during the robbery. (*Scoggins, supra*, 9 Cal.5th at p. 677, citing *Clark, supra*, 63 Cal.4th at pp. 618-623.)

The major participant and reckless indifference factors significantly overlap. (*Clark, supra*, 63 Cal.4th at p. 615.) Thus, although defendant has conceded that substantial evidence supports the trial court's finding that he was a major participant in the robbery, we consider all relevant factors from both categories to determine whether substantial evidence support the court's finding that he acted with reckless indifference to human life.

14

Defendant, after summarizing the evidence in the light most favorable to his claim that because the shooting was spontaneous and unexpected and he was in the back office, the facts as to him are comparable to getaway-driver cases such as *In re Taylor* (2019) 34 Cal.App.5th 543, 559. Defendant concludes that the robbery was a "'garden-variety armed robbery,'" an expression quoted in *Taylor*, at page 559, and attributed to *Banks, supra*, 61 Cal.4th at page 802. However, in *Clark*, the California Supreme Court explained that "a robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun is what we meant by 'a garden-variety armed robbery' in *Banks . . . .*" (*Clark, supra*, 63 Cal.4th at p. 617, fn. 74.) In *Taylor*, the target of the planned late-night crime was a closed liquor store with just one employee present. (*Taylor*, at p. 558.) There, the evidence was insufficient to show that the defendant knew that his accomplice was armed or might become violent; and the defendant was the getaway driver who never got out of his car, could not see the shooting, did not supply the gun, and left the scene only when he saw help was coming. (*Id*. at pp. 557-560.) Moreover, that defendant thought he was assisting in an "unarmed snatch-and-grab." (*Id*. at p. 556.)

Defendant here was not a getaway driver, the business was not closed, defendant knew his accomplices were armed and he knew the people inside would be robbed at gunpoint. We thus reject the argument that this was a "garden-variety armed robbery."

Moreover, considering the totality of the evidence in the light most favorable to the prosecution, we find substantial evidence that defendant acted with a reckless disregard for human life. First, despite defendant's denial at the evidentiary hearing, the evidence at trial suggests defendant played a major

15

part in planning the robbery as he told Bionghi about the store in El Monte, the tax business, and the charity box, explaining that it would be a quick job because he knew where the money was. It is thus reasonable to infer defendant was aware when the plan was formed that firearms would be used, as he stood just two or three feet from Soto and Bionghi when Soto opened the car's air filter and removed a .357 revolver, leaving in plain view two semiautomatic firearms and possible a third firearm of some kind. Although defendant denied knowing that Soto was the sort to murder someone, he admitted he had known him for about a year, knew Soto was armed before going into the tax office, and knew Soto was a little crazy and "didn't care about nothing."

Although he may not have been in the lobby when Soto shot Carmen, defendant was present and participating at the scene of the killing. The most reasonable inference from the evidence is that defendant was close enough to hear what was happening in the lobby. From the back office Maria was able to hear the front door slam and Carmen's surprised scream as Soto, defendant, and Quintero entered through the front door. Luis testified he saw a man pointing a gun toward Carmen's office, heard gunshots, a scream, and then another gunshot just before defendant entered the back office. Calvillo testified when defendant and the others asked Soto why he shot her, he explained it was because she screamed and yelled for her brother, and after he hit her and told to be quiet "she still wouldn't shut up." The trial court could reasonably infer that defendant was aware Soto had his gun drawn, Carmen was screaming, Soto had told her to shut up, he hit her, and fired his gun at least once before defendant reached the back office.

Although defendant may not have had the opportunity to prevent the killing when it took place, he certainly had the

16

opportunity to turn back and check on Carmen's condition. Instead, he continued to the back office where he robbed people at gunpoint. Neither did defendant check on Carmen once he robbed his victims. Visitor testified that sometime after hearing gunshots and checking around the area of his office, he went into the lobby of the tax office, where he saw Quintero holding a gun, and Soto and another man squatting on the floor, picking up money that was scattered all over the place. It is reasonable to infer defendant was in the lobby picking up money while Quintero was displaying a gun. Then, after Soto and Quintero ran out of the business, defendant joined them in the car, again without even checking on Carmen. Thus the trial court aptly concluded the robbery happened over a substantial period of time—a period in which defendant could have taken steps to minimize the possibility of violence, intervene when Soto was beating Carmen, or render or call for aid after the shooting, instead of callously continuing to rob Camilo, Maria and Luis, and then scooping up as much scattered money as possible.

We conclude substantial evidence supports factors relating to defendant's significant role in planning the robbery, defendant's presence at the scene of the killing, his failure to even attempt to minimize the violence, his awareness that a gun would be used and Soto's character, and his actions after lethal force was used. (See *Clark, supra*, 63 Cal.4th at p. 611; *Banks, supra*, 61 Cal.4th at p. 803; see *Scoggins, supra*, 9 Cal.5th at p. 677.) We also conclude substantial evidence supports defendant's awareness of the weapons used during the robbery, that at least two guns were used, defendant's failure to restrain the crime or give aid to the victim given the duration of the interaction with the victims, and defendant's lack of efforts to

17

minimize the risks of violence during the robbery.  (*Scoggins, supra*, at p. 677, citing *Clark, supra*, at pp. 618-623.)

**IV.    Youth as a factor**

Defendant argues the trial court was informed he was 19 years old at the time of the crime and the court failed to consider his youth as a factor in determining his state of mind.  For that reason he claims this court should reverse the order and remand with directions to consider his age, as the court did in *People v. Jones* (2022) 86 Cal.App.5th 1076, 1093 (*Jones*).  While youth can be a relevant factor in assessing whether a defendant acted with reckless indifference to human life (see *In re Moore* (2021) 68 Cal.App.5th 434, 439 453-454), it is not by itself a dispositive factor (*In re Harper* (2022) 76 Cal.App.5th 450, 470).

In *Jones*, the defense asked the trial court to consider that the defendant was "'barely 20 years old at the time of this crime,' 'immature' and 'still developing.'"  (*Jones, supra*, 86 Cal.App.5th at p. 1091.)  Despite evidence in the record of childhood trauma and mental illness, the trial court in that case did not consider youth as a factor in its determination of reckless indifference.  (*Ibid.*)  The appellate court presumed the trial court followed the law at the time but noted the hearing took place prior to the publication of appellate court decisions holding that youth must be considered in "'recognition of the science relating to adolescent brain development . . . ,'" such as *People v. Harris* (2021) 60 Cal.App.5th 939, 960 and *In re Moore, supra*, 68 Cal.App.5th at page 454.  (*Jones, supra*, at pp. 1091-1092, quoting *People v. Harris*, at p. 960, and citing *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990-991.)

Though *Jones* was published after defendant's evidentiary hearing, the cases on which the *Jones* court relied were all published prior to defendant's evidentiary hearing, and

18

defendant told the court he was 19 years old at the time of the crime. We presume the trial court followed the law in making its ruling and that it duly considered any evidence presented. (See *Jones, supra*, 86 Cal.App.5th at p. 1092.) Defendant did not present evidence suggesting his immaturity or childhood experiences caused him to act with ""impetuosity, and failure to appreciate risks and consequences""" (*People v. Ramirez, supra*, 71 Cal.App.5th at p. 990) or to be "impulsive rather than criminally sophisticated" (*Jones, supra*, at p. 1091). As the People point out, defendant had previously committed at least three robberies. Given defendant's role in planning the robbery with Soto, whom defendant knew to be a little crazy, his awareness of the weapons used, his failure to restrain the crime or give aid to the victim and his lack of efforts to minimize the risks of violence during the robbery, as we discussed above, we agree with the People that the evidence showed him to be sophisticated and experienced rather than immature and inexperienced.

Defendant's actions after Soto shot Carmen are particularly probative of defendant's reckless indifference. The circumstances were not ambiguous, and the evidence did not give rise to different inferences that "may not be very probative of his mental state," such as immediate flight after the shooting. (*Scoggins, supra*, 9 Cal.5th at pp. 679-680.) The only reasonable inference to be drawn from defendant's actions is that he was concerned only with money, not human life, to which he was recklessly indifferent. "Youth can distort risk calculations. Yet every 18 year old understands bullet wounds require attention. The fact of youth cannot overwhelm all other factors." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595, citing *Tison v. Arizona, supra*, 481 U.S. at pp. 142, 151-152, 158.) In sum, when youth is

19

overborne as here by the "*Banks-Clark-Scoggins* factors" to support a finding of indifference to human life, being 19 years old at the time of the crime is not a reason for the trial court to grant the petition.

Considering the totality of the circumstances we conclude substantial evidence supports the trial court's finding that defendant was a major participant in the robbery and acted with reckless disregard for human life, such that a rational trier of fact could find beyond a reasonable doubt that defendant remains guilty of felony murder under section 189 as amended effective January 1, 2019.

## DISPOSITION

The order denying the section 1172.6 petition is affirmed.

_____

CHAVEZ, Acting P. J.

We concur:

_____

HOFFSTADT, J.

_____

KWAN, J.*

---

\* Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20